**ROBERT SIEGEL, INC.,**
**et al., Appellants,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 05–CV–706.**

District of Columbia Court of Appeals.

Argued Nov. 29, 2005.

Decided Feb. 9, 2006.

Dale A. Cooter, Washington, DC, for appellants.

Stephen C. Rogers, Special Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General, and Ed-

ward E. Schwab, Deputy Attorney General, were on brief, for appellee.

Before WASHINGTON, Chief Judge, and GLICKMAN and KRAMER, Associate Judges.

WASHINGTON, Chief Judge:

Appellants Robert Siegel Inc., 1352–1354 Corporation, and AB Enterprises ("the Siegel Group")[1] seek review of a June 15, 2005 order dismissing a complaint against the District of Columbia seeking to enjoin it from moving forward with its plan to acquire a parcel of land for the proposed baseball stadium site on the grounds that the statutorily required revaluation of the land acquisition cost was made in bad faith. Appellants contend that the trial court erred in finding that: 1) the appellants have an adequate remedy at law and, therefore, are not entitled to equitable relief; 2) the appellants' claim was not yet ripe; and 3) the Ballpark Omnibus Financing and Revenue Act of 2004 does not provide for a private right of action. Although our reasons differ somewhat, we affirm the decision of the trial court.

## I.

### Statutory Background

On September 29, 2004, the Honorable Anthony Williams, Mayor of the District of Columbia, the District of Columbia Sports and Entertainment Commission and the Baseball Expos, L.P., entered into an agreement to bring Major League Baseball back to the District. Under the terms of the agreement, the District must fund and construct a new baseball stadium complex, and the agreement designates a proposed site for construction on the area bounded by N Street, S.E., Potomac Avenue, S.E., South Capitol Street and I Street, S.E. On December 2, 2004, the District of Columbia City Council adopted the Ballpark Omnibus Financing and Revenue Act of 2004 ("the Stadium Financing Act"). The Stadium Financing Act was drafted based on findings by the D.C. Council that:

(1) The ownership, construction, development, or renovation of a publicly financed stadium in the District of Columbia, after October 1, 2004, for use primarily for professional athletic team events is a municipal use that is in the interest of, and for the benefit of, the citizens of the District of Columbia because such a publicly-owned stadium or arena will contribute to the social and economic well-being of the citizens of the District of Columbia and significantly enhance the economic development and employment opportunities within the District of Columbia.

(2) To further that interest, it is appropriate for the District of Columbia to pay all or a portion of the cost of constructing, developing, or renovating a stadium and, to that end, to impose a ballpark fee based upon the gross receipts of certain persons doing business within the District of Columbia; to impose a tax on the sales of tickets, or rights to admission, to certain events at the stadium; to impose a tax on sales of

---

1. The three named appellants, Robert Siegel Inc., 352–1354 Corporation, and AB Enterprises, are all businesses that own property within the proposed baseball stadium site. All three entities are owned by Robert Siegel, though he is not personally a party to this lawsuit. The Siegel Group owns parcels of land in the District of Columbia located at 1345 Half Street, S.E., 1339–41 Half Street, S.E., 24 O Street, S.E., 1352–54 South Capitol Street, S.E., 1356 South Capitol Street, S.E. along with eleven vacant lots near the intersection of South Capitol Street and N Street, S.E. All of this real estate lies within the proposed baseball stadium site.

personal property and certain services at the stadium and to utilize the revenues derived from such fees and taxes to pay all or a portion of the cost of development, construction, or renovation of the stadium or the debt service on bonds or other evidence of indebtedness issued to finance all or a portion of the cost of the development, construction, or renovation of the stadium; to acquire real property in furtherance of these public purposes; to lease the stadium to one or more professional baseball clubs; and for the District of Columbia and any duly designated District government agency or instrumentality to enter into binding and enforceable contracts to further these purposes.

D.C.Code § 10–1601.01–02 (2005 Supp.). The D.C. Council also adopted a series of amendments known collectively as the Private or Alternative Stadium and Cost Trigger Emergency Act of 2004 ("Cost Ceiling Act"), concurrently with the Stadium Financing Act, geared toward controlling the stadium's final cost. The amendments required the District's Chief Financial Officer ("CFO"), Natwar M. Gandhi, to re-estimate the cost of acquiring the stadium site while setting a $165 million cap for cost of land acquisition and infrastructure preparation. D.C.Code §§ 10–1601.01,.07 (2005 Supp.). The relevant portion of the amendment states:

(d) Prior to May 15, 2005, and prior to the date upon which the District enters into any obligation to acquire or purchase any property on a site bounded by N Street, S.E., Potomac Avenue, S.E., South Capitol Street, S.E., and 1st Street, S.E. ("primary ballpark site"),

the Chief Financial Officer shall re-estimate the costs to the District for land acquisition and infrastructure and provide a report on this re-estimate to the Mayor and the Council.

(e) If the total amount of these re-estimated costs to the District exceeds $ 165 million, the primary ballpark site shall be deemed financially unavailable by the District pursuant to this subchapter. Pursuant to this subchapter, the Mayor and the Sports and Entertainment Commission shall pursue replacement of the primary ballpark site with a substantially less costly site in the District, subject to the approval of Baseball Expos, L.P., or its assigns or successors, in accordance with the Baseball Stadium Agreement.

D.C.Code § 10–1601.07(d, e) (2005 Supp.).

On March 30, 2005, the CFO submitted a letter to the Mayor and the Council outlining his re-estimate of the costs that the District would incur in acquiring and readying the proposed ballpark land. The letter stated that, "based on data available through March 18, [the CFO study] finds that the cost to the District to acquire roughly 13.8 acres of land, remediate the site, and provide Ballpark-related infrastructure improvements is approximately $161.3 million,[2] including $11.9 million in contingency costs." Letters from Natwar M. Gandhi, Chief Financial Officer of the District of Columbia to Anthony Williams, Mayor of the District of Columbia and Linda W. Cropp, Chairman of the Council of the District of Columbia (March 30, 2005).[3] Some Council members initially questioned several of the re-estimate's

---

2. The $161.3 million ballpark site acquisition cost estimate includes $77.1 million in property costs, $8 million in environmental costs and $76.2 million in infrastructure costs.

3. The CFO's revised cost estimate was an increase from the original December 2004 estimate of $11.5 million that did not take into account costs for the relocation of existing owners and environmental preparation.

conclusions, and Mr. Gandhi responded to the Council by addressing fourteen individual issues [4] about the accuracy and reliability of the report, concluding that no alteration of the $161.3 million figure was required.

## II.

### Procedural History

On April 11, 2005, the Siegel Group filed suit in the Superior Court seeking preliminary and permanent injunctive relief to prevent the stadium project from moving forward.[5] The Siegel Group asserted that while the CFO and the District facially complied with the requirements of the Act, the revaluation study had been conducted in bad faith and the District should be required to find another site for its proposed stadium. On April 20, 2005, the District filed a motion to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim. On June 15, 2005, the court granted the defendant's motion to dismiss on the grounds that the District of Columbia's eminent domain statute granted the plaintiffs a sufficient remedy at law [6]; the case was not ripe because at the time, the District had not invoked its eminent domain powers; and the plaintiffs had no private right of action to challenge the CFO's revaluation of the stadium site purchase estimate.

On October 27, 2005, Deputy Attorney General Edward E. Schwab notified this court that the District had initiated eminent domain proceedings in the Superior Court of the District of Columbia in a consolidated proceeding against sixteen parcels in the proposed stadium site, including the parcels belonging to the petitioner. *See District of Columbia v. 521,-025 Square Feet of land in the District of Columbia, More or Less, et al.*, Civil No. 05–0008505.

4. The Council's questions regarding the CFO's revaluation of the subject property included: 1) How were the costs calculated; 2) could the study be relied on as an appraisal of market value; 3) was the estimate of $133 per square foot reasonable; 4) did the study take into consideration seventeen recent property sales in the area; 5) did the study miscalculate the value of the land by $6 million dollars; 6) are the eminent domain estimate costs reasonable; 7) did the revaluation include the costs of relocating the existing landowners; 8) what are the estimated tax losses for the existing owners; 9) are the costs of buying out business included; 10) had the current property owner been contacted; 11) why did the revaluation report only include a Phase I environmental study; 12) did the revaluation study include remediation costs for public spaces; 13) was the $19.8 million allocated for upgrading the Navy Yard Metro Station sufficient; and 14) did the costs of diverting water and sewer service to the stadium include the costs of tunnel materials and the cost of diverting water flow during construction. Letter from Natwar M. Gandhi, Chief Financial Officer of the District of Columbia to Linda W. Cropp, Chairman of the Council of the District of Columbia (April 25, 2005).

5. On April 26, 2005, Carol J. Mitten, Director of the District's Office of Property Management sent written notice to the Siegel Group's attorney, Mr. Dale Cooter, Esquire, that the District intended to seek an appraisal of the Siegel Group's properties and make an offer on those properties subject to the appraisal value.

6. The District of Columbia Superior Court Civil Rules govern the means by which a litigant may defend against a taking of their property. It states: "If a defendant has any objection or defense to the taking of property, the defendant shall serve an answer within 20 days after the service of notice upon the defendant. The defendant shall identify the property in which the defendant claims to have an interest, state the nature and extent of the interest claimed, and state all the defendant's objections and defenses to the taking of the property." Super. Ct. Civ. R. 71A (e).

## III.

### A. Review of the Siegel Group's Claim

■ At the time the Siegel Group brought this suit, the appellants sought to enjoin the District from proceeding with its plans to procure the necessary land for the stadium project. The trial court, however, appropriately held that the claim was not ripe because the District had not yet moved forward with any eminent domain proceedings.[7] Now that the District has initiated eminent domain proceedings, the appellants' claim is ripe and they need no longer seek injunctive relief by asserting a private right of action under the Stadium Financing Act. Appellants instead assert an affirmative defense to the District's eminent domain power, alleging that the CFO's certification of valuation was made in bad faith, thereby neutralizing the catalyst for the condemnation proceedings.

■ We could simply affirm the trial court's decision in this case granting the motion to dismiss to the District solely on the lack of a private right of action under the Stadium Financing Act.[8] Both sides argue, however, and we agree, that given the pending condemnation proceeding and appellants' interest in pursuing the claim raised here as an affirmative defense in that proceeding, that the interests of judicial economy are best served by our deciding whether the Stadium Financing Act allows private land owners to challenge the good faith estimate of costs associated with the construction of the new baseball stadium as a defense to the eminent domain proceedings brought by the District. We conclude that as a matter of law, the sole judges of whether or not the CFO's estimate was made in bad faith are the D.C. Council and the Mayor.

7. As the appellants' claim was based solely on the fear of a future course of action of the District at the time the claim was filed, we agree with the trial court's determination that it was not ripe for review. *See Laird v. Tatum*, 408 U.S. 1, 14, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154, 164 (1972) (requiring a "specific present objective harm or a threat of specific future harm" for a claim to be ripe); *see also Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S.Ct. 2026, 2030, 155 L.Ed.2d 1017, 1024 (2003) ("Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' ") (citations omitted).

8. The trial court applied the three-part test enumerated in *Coates v. Elzie*, 768 A.2d 997 (D.C.2001), adopted in part from the United States Supreme Court Decision in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to determine whether or not the ap-

pellants had a private right of action under the statute. The relevant factors, as stated by this court are:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" ... ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

*Coates, supra,* 768 A.2d at 1001 (citing *In re D.G.,* 583 A.2d 160, 166 (D.C.1990)) (internal citations omitted) (emphasis in the original). "The 'ultimate issue' is whether the legislature intended to create a particular cause of action, because 'unless such [legislative] intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.' " *Id.* (citing *Karahalios v. Nat'l Fed'n of Fed. Employees,* 489 U.S. 527, 532–33, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989)). We are satisfied that the Siegel Group cannot bring a challenge by asserting a private right of action under the statute.

## B. Legal Analysis

■■■ "The question before us is essentially one of statutory construction, a quintessential issue of law subject to *de novo* review." *Richardson v. Easterling*, 878 A.2d 1212, 1216 (D.C.2005) (citing *In re Doe*, 855 A.2d 1100, 1102 (D.C.2004)). The first step this court takes when interpreting a statute is to look at the language. *See National Geographic Soc'y v. District of Columbia Dep't of Empl. Servs.*, 721 A.2d 618, 620 (D.C.1998). "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983).

■■■ " 'The literal words of [a] statute, however, are not the sole index to legislative intent, but rather, are to be read in the light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice.' " *Columbia Plaza Tenants' Ass'n v. Columbia Plaza L.P.*, 869 A.2d 329, 332 (D.C.2005) (quoting *Boyle v. Giral*, 820 A.2d 561, 568 (D.C.2003)). In the interest of maintaining the cohesion between this court's statutory interpretation and the policy initiatives behind the legislation, we also consult the legislative history of a statute for guidance as necessary. *See Jeffrey v. United States*, 878 A.2d 1189, 1193 (D.C.2005) (citing *Abadie v. D.C. Contract Appeals Bd.*, 843 A.2d 738, 742 (D.C.2004)).

The District takes the position that neither the Stadium Financing Act nor the Cost Ceiling Act provides for the independent review of the CFO's cost re-estimation study beyond that undertaken by the Mayor and the D.C. Council. Appellants on the other hand assert that because the cost re-estimation study is the catalyst for any condemnation proceedings involving the baseball stadium, the Council must

have intended for those individuals whose property is subject to condemnation proceedings under the Act to have a right to challenge the CFO's certification prior to the condemnation process. What is clear from our reading of the Act is that the statute is silent on the issue of whether the Council intended for citizens to be able to challenge the good faith basis for the CFO's cost re-estimation study. Because the statute is silent, we must look to the legislative intent and circumstances surrounding the enactment of the Act to ascertain the Council's true intentions. *Jeffrey, supra*, 878 A.2d at 1193.

The legislative history for the Stadium Financing Act makes clear that while ending the thirty-three-year absence of Major League Baseball in the District was the primary motivator behind the public funding of the baseball stadium, there were other fiscal initiatives supporting the measure. The Council pointed specifically to the economic development spurred by the construction of the MCI Center in the Penn Quarter commercial district and expressed its hope that the addition of a new stadium along the Anacostia waterfront would promote similar growth in that area on both sides of the river. Similarly, the Council noted the significant revenue increases that the District stood to gain in the restaurant and hotel industry from baseball fans who were not residents of the District but chose to attend games here. Given the focus of the Council on enhancing revenue opportunities for the city and the legislation's overarching purpose to quickly and efficiently establish a site for a Major League team in the District, it is improbable that the Council intended to grant landowners the power to interfere with the economic development plans of the city by giving them the right to challenge the legitimacy of a revaluation study that would give the District the pow-

er to move forward with acquiring their land.

The appellants, relying primarily on our discussion in *District of Columbia v. Sierra Club*, argue that regardless of intent, judicial review of government agencies is presumed at common law in order to prevent the arbitrary and uncontrolled actions of public and administrative officers. 670 A.2d 354 (D.C.1996). Thus, the appellants contend that they have the right to seek judicial review of the CFO's revaluation study as a defense to the condemnation proceedings in Superior Court. In *Sierra Club*, we addressed a challenge to a decision by the Mayor to suspend the curbside recycling collection program which the appellant in that case claimed was mandated by statute. Initially, we rejected the District's implied right of action analysis[9] argument in favor of a presumption for judicial review of agency action. *Sierra, supra*, 670 A.2d at 357–59. Then we turned to the language of the controlling statute and, finding that it lacked any explicit language providing for the level of executive and legislative oversight that the appellants sought, we held that it would be inappropriate for this court to intrude on the Mayor's discretionary executive duties. 670 A.2d at 362–65.

In *Sierra Club, supra*, this court quoted language from the decision in *Quattlebaum v. Barry*, 671 A.2d 881, 885 (D.C. 1995), and it would be helpful to repeat it here:

> [T]here are many competing claims on the District's limited financial resources. The Council cannot accommodate them all. Hard and painful choices must be made. The constitutional responsibility

to make such choices falls upon our elected officials. They, and not the courts, are obliged "to reconcile the demands of ... needy citizens with the finite resources available to meet those demands." *Dandridge v. Williams*, 397 U.S. 471, 472, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). We are not authorized "to second-guess [District] officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Id.* at 487, 90 S.Ct. 1153. We should accede to a request for judicial intrusion upon what we regard as a core [government] function only if it is plain that the Council's action contravenes the federal legislation upon which appellants rely.

670 A.2d at 364 (quoting *Quattlebaum, supra*, 671 A.2d at 885). Just as the court in *Sierra Club* was asked, inappropriately, to second-guess the Mayor's discretionary executive decision regarding the distribution of public funds, in this case the court is asked to second-guess the Mayor's and the Council's discretionary executive and legislative decisions regarding the adequacy of the CFO's performance. It would be improper for us to suggest that the Mayor and "the Council intended the distribution of scarce funds to be determined by the outcome of a race to the courthouse door." *Sierra Club, supra*, 670 A.2d at 364. "The need for judicial restraint ... is just as pronounced as it was in *Quattlebaum*" and *Sierra Club. Id.*

 The CFO is a semi-autonomous entity, empowered to enter into contracts on behalf of the city and subordinate only to the Mayor and the Council.[10] D.C.Code

---

9. *See supra* note 8.

10. Among the Chief Financial Officer duties, he must complete the following:

(10) Supervising and assuming responsibility for the levying and collection of all taxes, special assessments, licensing fees, and other revenues of the District of Columbia (as may be required by law), and re-

§ 1–204.24c (2001). In this case, the Council sought financial information from the CFO to enable it to decide a budgetary issue: whether the acquisition of the ballpark land would go forward. The CFO provided the information requested, and the Council viewed it as its responsibility to decide whether the information provided was satisfactory. The Council evidently took that responsibility seriously, as the record reflects—it evaluated the CFO report, asked tough questions of the CFO, appraised the CFO's answers, and in the end decided that it was satisfied.[11]

This was a legislative decision, committed to the legislature's discretion—akin to deciding whether or not to enact a law. Appellants essentially are seeking a court ruling that second-guesses the Council's legislative judgment, i.e., its assessment that the information it received from the CFO was satisfactory to it. To do that absent statutory warrant would be, in our view, to trespass on the authority committed to the Council. It would be like evaluating whether the Council had good enough reasons to enact a law that is otherwise within its authority to enact. Had the re-estimation study simply not been produced, appellants could have legitimately claimed that the District was acquiring the land in violation of the statute. That, however, is not the case before us. There is nothing in the legislation suggesting that it intended the courts to have such oversight power. Nor is it necessary for the courts to assert such a power to protect the property owners in the event the acquisition costs turn out to be greater than the CFO estimated, for the eminent domain compensation procedure assures that the CFO's estimate will not limit the compensation that will have to be paid. As is the case here, when the Mayor and Council are engaged in essential oversight and budget functions, this court " 'should

---

ceiving all amounts paid to the District of Columbia from any source (including the Authority);

(11) Maintaining custody of all public funds belonging to or under the control of the District government (or any department or agency of the District government), and depositing all amounts paid in such depositories and under such terms and conditions as may be designated by the Council (or by the Authority during a control year);

(13) Apportioning the total of all appropriations and funds made available during the year for obligation so as to prevent obligation or expenditure in a manner which would result in a deficiency or a need for supplemental appropriations during the year, and (with respect to appropriations and funds available for an indefinite period and all authorizations to create obligations by contract in advance of appropriations) apportioning the total of such appropriations, funds, or authorizations in the most effective and economical manner;

(14) Certifying all contracts (whether directly or through delegation) prior to execution as to the availability of funds to meet the obligations expected to be incurred by the District government under such contracts during the year;

(16) Certifying and approving prior to payment all bills, invoices, payrolls, and other evidences of claims, demands, or charges against the District government, and determining the regularity, legality, and correctness of such bills, invoices, payrolls, claims, demands, or charges;

D.C.Code § 1–204.24c (10, 11, 13, 14, 16) (2001).

11. In addition, though not a part of the record, this court can take judicial notice of the thorough and sometimes contentious hearings before the D.C. Council questioning the legitimacy of the CFO study. "Judicial notice may be taken at any time, including on appeal." *United States v. Burch,* 169 F.3d 666, 671 (10th Cir.1999). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Christopher v. Aguigui,* 841 A.2d 310, 312 (D.C.2003) (quoting FED. R. EVID. 201(b)).

accede to a request for judicial intrusion' only if it is 'plain' that the Council intended to restrict the Mayor's authority in this regard." *Sierra Club, supra,* 670 A.2d at 364 (quoting *Quattlebaum, supra,* 671 A.2d at 885).

For the foregoing reasons, the decision of the Superior Court is, therefore,

*Affirmed.*