**John BARNHARDT, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 06–CF–604.

District of Columbia Court of Appeals.

Submitted Jan. 29, 2008.
Decided Aug. 7, 2008.

Thomas T. Heslep was on the brief, Washington, for appellant.

Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Lisa H. Schertler, and Aimee C. Jimenez, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and BLACKBURNE–RIGSBY, Associate Judges, and PRYOR, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

Appellant John Barnhardt was charged with assaulting or resisting a police officer, destroying property, reckless driving, and fleeing a law enforcement officer. A jury found Mr. Barnhardt guilty of reckless driving and fleeing a law enforcement officer. Mr. Barnhardt contends that the trial court erred in denying his request for a jury instruction on the affirmative defense to the charge of fleeing a police officer under D.C.Code § 50–2201.05b (c) (2005 Supp.). We affirm.

## I.

In the early morning hours of May 7, 2005, Metro Transit Officer Lennard

Smith observed a vehicle blocking the flow of traffic. The vehicle was parked in the travel lane at a green traffic light, but the engine was running. The vehicle remained parked through two cycles of the light. Officer Smith sounded his emergency air horn and cycled his emergency lights, but the occupant of the car, Mr. Barnhardt, did not respond. Metropolitan Police Department (MPD) Officer Mark Treu and Metro Transit Officer Kenneth Honick arrived on the scene and were wearing their police uniforms and traveled in marked police vehicles. Officer Treu came to assist Officer Smith and observed that Mr. Barnhardt appeared to be asleep behind the wheel with a bundle of money in his hands. After Officer Treu banged his flashlight on the window, Mr. Barnhardt sat up and looked around. Mr. Barnhardt reached toward his waistband in an attempt to hide what appeared to be money and then reached for something by the center console. Officer Treu drew his service weapon, but kept it by his side, and firmly told Mr. Barnhardt to stop reaching around and open the door or roll down the window. When Mr. Barnhardt kept reaching for the center console, Officer Honick testified that all officers then drew their service weapons and pointed them at Mr. Barnhardt. Officer Honick called out "crossfire" to warn the other officers not to shoot one another.

Mr. Barnhardt did not obey the officers and continued to reach toward the console, either to hide what appeared to be money or to reach for something by the console. Officer Treu unsuccessfully attempted to break the driver's side window with his asp—a police baton. After the officer attempted to break the window, Mr. Barnhardt opened his eyes widely; put his vehicle in reverse; and backed up at a high rate of speed. Mr. Barnhardt's car struck a police vehicle, and he then fled the scene. He drove between approximately sixty and seventy miles per hour heading eastbound out of the District of Columbia and into Prince George's County, Maryland. Officer Honick followed Mr. Barnhardt with his sirens and lights turned on. Mr. Barnhardt failed to yield to any traffic lights or stop signs throughout the pursuit and, at times, exceeded posted speed limits. He took the police around in circles before traveling back into the District of Columbia, where he drove onto the sidewalk and into a field.

Officer Honick continued to pursue Mr. Barnhardt upon his return to the District, and a number of other MPD cruisers joined the pursuit. A United States Park Police helicopter illuminated the chase from above, and the police were finally able to box Mr. Barnhardt in and apprehend him near his sister's home on J Street.

At trial, Mr. Barnhardt's defense was that he failed to stop because he was afraid for his life, and he offered testimony from his sister and his father. His sister, Rosita Maria Young, testified that Mr. Barnhardt called her during the chase, that he sounded scared and upset, and that she told him to come to her home on J Street. Additionally, Mr. Barnhardt's father, Samuel Barnhardt, testified that his daughter told him that Mr. Barnhardt feared for his life and "he was not going to stop until he was where he could be secured because he was fearing safety for his life."

Mr. Barnhardt's counsel requested that the trial court instruct the jury on the affirmative defense provided by the statute to the charge of fleeing a law officer.[1] The

---

1. D.C.Code § 50–2201.05b (c) (2005 Supp.) provides for an affirmative defense to the

crime of fleeing an officer if a defendant "can show, by a preponderance of evidence, that

government objected arguing that, because Mr. Barnhardt had not testified, there was no evidence that he had a "reasonable belief" that he was at risk. The government also noted that appellant "fled all the way into P.G. County and back" and that "[a]t some point his risk of being shot diminishe[d]." The trial court denied Mr. Barnhardt's request on the grounds that the instruction would be "wholly speculative" because there was no way for the jury to know whether Mr. Barnhardt was actually frightened, what he might have been frightened of, or what he perceived at the time he fled.

## II.

■■■ In reviewing a trial court's denial of jury instructions requested by the defense, we consider the evidence in the light most favorable to the defendant. *Simms v. United States,* 867 A.2d 200, 204 (D.C. 2005) (citing *Adams v. United States,* 558 A.2d 348, 349 (D.C.1989)). A defendant is "entitled to jury instruction on any recognized defense for which there is sufficient evidence for a reasonable jury to find in the defendant's favor." *Id.* at 204 (internal quotation marks and citation omitted). A requested instruction is not appropriate if, as a matter of law, the defendant would not be entitled to the defense. *See How-ard v. United States,* 656 A.2d 1106, 1113 (D.C.1995).

The statutory offense of fleeing a law enforcement officer in a motor vehicle is violated pursuant to D.C.Code § 50–2201.05b when:

> (b)(1) An operator of a motor vehicle who knowingly fails or refuses to bring the motor vehicle to an immediate stop, or who flees or attempts to elude a law enforcement officer, following a law en-
>
> the failure to stop immediately was based upon a reasonable belief that the defendant's

forcement officer's signal to bring the motor vehicle to a stop, shall be fined not more than $1,000, or imprisoned for not more than 180 days, or both.

[ . . . ]

> (c) It is an affirmative defense under this section if the defendant can show, by a preponderance of the evidence, that the failure to stop immediately was based upon a reasonable belief that the defendant's personal safety is at risk. In determining whether the defendant has met this burden, the court may consider the following factors:
>
> (1) The time and location of the event;
>
> (2) Whether the law enforcement officer was in a vehicle clearly identifiable by its markings, or if unmarked, was occupied by a law enforcement officer in uniform or displaying a badge or other sign of authority;
>
> (3) The defendant's conduct while being followed by the law enforcement officer;
>
> (4) Whether the defendant stopped at the first available reasonably lighted or populated area; and
>
> (5) Any other factor the court considers relevant.

■■■ Mr. Barnhardt contends the trial court erred by failing to instruct the jury on the affirmative defense for the charge of fleeing from a law enforcement officer in a motor vehicle because there was sufficient evidence to support the conclusion that he "fled the police because of a reasonable fear for his own safety." He argues that the trial judge improperly denied his request for a jury instruction because he did not testify. While a defendant frequently provides evidence of a reasonable fear through his own testimony, his testi-

personal safety was at risk."

mony is not required for a defense to go to the jury if other evidence provides a factual basis from which the jury could find that the defendant had such fear, and that it was reasonable. *Reid v. United States,* 581 A.2d 359, 367 (D.C.1990). However, a defendant's failure to testify may preclude the jury from obtaining knowledge relevant to a proposed jury instruction. *Bonilla v. United States,* 894 A.2d 412, 418–19 (D.C.2006).

Mr. Barnhardt's argument is unavailing. Under the plain meaning of D.C.Code § 50–2201.05b, the crime of fleeing a police officer and thus the affirmative defense is only applicable after "a law enforcement officer [ ] signal[s] to bring the motor vehicle to a stop" and that vehicle operator fails to do so. *See also Robert Siegel, Inc. v. District of Columbia,* 892 A.2d 387, 393 (D.C.2006) (noting that primary and general rule of statutory construction is that intent of lawmaker is to be found in language he has used). Mr. Barnhardt asserts that he had a reasonable fear based upon the police pointing flashlights and guns in his face to awaken him, trying to break his window with an asp, and shouting "crossfire." Although, this argument explains why he initially fled, the affirmative defense does not cover this action; rather, it covers a failure to stop once being signaled by police officers to do so.[2]

Therefore, in determining whether the fleeing statute and the affirmative defense thereto apply in this case, we begin our analysis at the point when the police officers pursue and follow Mr. Barnhardt and signal him to stop. On the facts of this case, we conclude as a matter of law that Mr. Barnhardt was not entitled to the affirmative defense jury instruction because no reasonable jury could conclude that he was entitled to it.[3] Notwithstanding Mr. Barnhardt's initial reaction of fleeing when he awakened and was startled to see the officers, once the police officers began pursuing him through Washington, D.C. and Maryland, he ignored traffic lights and stop signs, exceeded the speed limit, drove in circles on roads and fields, and drove on the sidewalk. By that point, there was no mistaking that he was being pursued by police officers who wore uniforms, drove marked cars, and used emergency lights and horns to demonstrate authority and urgency. Most notably, Mr. Barnhardt never voluntarily stopped for

---

**2.** The legislative history also supports our interpretation that the statute is meant to deter vehicular flight and the affirmative defense is limited to situations in which public safety considerations make it impractical or unreasonable to require a motorist to stop immediately after being signaled to do so by law enforcement officers, but requires those vehicles to stop as soon as it is practicable to do so in light of traffic and location considerations. *See Siegel, supra,* 892 A.2d at 393 (in interest of maintaining cohesion between our statutory interpretation and the policy initiative behind legislation, we consult legislative history of the statute for guidance as necessary). The legislative history indicates that the District of Columbia Council's purpose in enacting the fleeing statute was to address the "dangers of vehicular flight to motorists, law enforcement officers, and innocent third parties. The intent of the law is to improve

public safety by deterring vehicular flight." D.C. Council Law 15–239, Bill 15–0759, the Fleeing Law Enforcement Prohibition Act of 2004 at 1 (2004). The affirmative defense likewise was included in the statute for "public safety reasons." *Id.* "The committee recognized that there may be situations when it is not safe for drivers to obey a signal to stop." *Id.*

**3.** Although the trial judge denied Mr. Barnhardt's request on the grounds that the instruction would be "wholly speculative," and there was no way for the jury to know what Mr. Barnhardt was actually frightened of and what he perceived at the time he fled, we may affirm on any valid ground supported by the record. *Randolph v. United States,* 882 A.2d 210, 218 (D.C.2005).

the police "at the first reasonably lit, populated area." *See* D.C.Code § 50–2201.05b (c)(4). He was eventually boxed in near his sister's home but only after a long chase through two jurisdictions.

While no one factor is dispositive to be entitled to assert the defense, Mr. Barnhardt failed to satisfy any of the factors outlined in D.C.Code § 50–2201.05b (c). These factors include: (1) The time and location of the event; (2) Whether the law enforcement officer was in uniform, in a marked vehicle, and displaying a badge or other sign of authority; (3) The defendant's conduct during the pursuit; (4) Whether the defendant stopped at the first reasonably lit, populated area; and (5) Any other relevant factors. D.C.Code § 50–2201.05b (c). The time—early morning—and the location—on public streets—is a neutral factor, and Mr. Barnhardt has not presented any evidence to suggest it weighs in his favor. Officers Treu and Honick were wearing their police uniforms, traveled in marked police cars, and throughout the two-state pursuit Officer Honick displayed his authority by flashing his lights and using his sirens. In addition, a number of MPD cruisers and a United States Park Police helicopter joined the pursuit, and the helicopter illuminated the chase from above. There could be no doubt that law enforcement officers were following Mr. Barnhardt and displayed their authority. As explained above, Mr. Barnhardt's conduct during the pursuit evidenced a person recklessly trying to flee from officers, not someone looking for the "first reasonably lit, populated place to stop his vehicle." Lastly, there

are no other relevant factors that weigh in Mr. Barnhardt's favor for failing to stop his vehicle after the pursuit began.

Even assuming without concluding that Mr. Barnhardt had a "reasonable fear"[4] when he initially fled the police officer, no jury could reasonably conclude that Mr. Barnhardt failed to stop because he lacked a safe place and/or method to pull over. Instead, this was a situation where he was recklessly trying to elude police officers whose identities were not in question. Accordingly, we conclude that as a matter of law Mr. Barnhardt was not entitled to the jury instruction and therefore the trial court did not abuse its discretion by failing to give it.

*So ordered.*

---

4. We note that a jury could find that Mr. Barnhardt actually feared for his safety at the time he fled because of the hearsay statement of his sister—"he sounded scared when he called me"—and double hearsay statement of his father—his daughter told him that Mr. Barnhardt feared for his life—elicited by the government. The jury could have found that Mr. Barnhardt's fear was reasonable based on the officers' testimony about how they roused him when they found him sleep in the car, surrounded his car, shone flashlights on him, tried ·to break his window, and shouted "crossfire."