*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CM-1046

MANUEL MEJIA-CORTEZ, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-5129-15)

(Hon. A. Franklin Burgess, Trial Judge)

(Argued February 21, 2018                    Decided August 12, 2021)

*Aaron Marr Page* for appellant.

*Christopher R. Howland*, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *Nigel Cooney*, and *Melissa M. Price*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and BECKWITH, *Associate Judges*, and WASHINGTON, *Senior Judge*.

Opinion for the court by *Associate Judge* BECKWITH.

Concurring opinion by *Senior Judge* WASHINGTON at page 16.

Opinion concurring in the judgment by *Associate Judge* THOMPSON at page 16.

BECKWITH, *Associate Judge*:  Appellant Manuel Mejia-Cortez was leaving the Georgia Avenue Metro station on his way home from watching a game at a friend's house when a transit police officer arrested him for suspected fare evasion.  In an ensuing search of a bag Mr. Mejia-Cortez was carrying, the arresting officer discovered a six pack of beer containing two opened half-full bottles.  The government prosecuted Mr. Mejia-Cortez in Superior Court for possessing an open container of alcohol (POCA).  After a bench trial, the trial court convicted him of violating the subsection of the POCA statute that prohibits possession of an open container of alcohol in any place "to which the public is invited" and "for which a license to sell alcoholic beverages has not been issued[.]"  D.C. Code § 25-1001(a)(4).[1]

This appeal involves Mr. Mejia-Cortez's challenge to the sufficiency of the government's evidence supporting his conviction—specifically, the evidence that the Metro station where Mr. Mejia-Cortez possessed the open beer bottles was not a place for which a license to sell alcohol had been issued.  The government may have been able to prove this element.  But where the government presented no proof of this element at trial, where it did not ask the trial court to take judicial notice of the

---

[1]  All references to the D.C. Code in this opinion are to the 2012 Replacement volume unless stated otherwise.

grounds it now offers as sufficient proof, and where the matter is not so free from doubt as to justify such a deviation from constitutional norms, we conclude that the evidence was insufficient to support Mr. Mejia-Cortez's POCA conviction. We therefore reverse that conviction and remand with instructions to enter a judgment of acquittal on that count.

## I.

According to the evidence at trial, Metro Transit Police Officer Zachary Gardner approached Manuel Mejia-Cortez in the Georgia Avenue Metro Station after watching Mr. Mejia-Cortez follow another passenger through the turnstile in a way Officer Gardner suspected was "piggy-backing" to avoid paying the fare for his trip. Though Officer Gardner intended to issue Mr. Mejia-Cortez a $50 citation for failure to pay, he decided instead to arrest him for fare evasion after Mr. Mejia-Cortez presented an identification card Officer Gardner believed (albeit erroneously) was fake. In a search incident to that arrest, Officer Gardner looked in a black plastic bag Mr. Mejia-Cortez was carrying and found six beer bottles—two full bottles that were sealed, two empty bottles, and two bottles about half full of beer. Mr. Mejia-Cortez was subsequently charged with POCA under D.C. Code § 25-1001(a)(1), which prohibits possessing an open container of alcohol in or upon a "street, alley, park, sidewalk, or parking area."

Testifying in his own defense through a translator, Mr. Mejia-Cortez stated that when Officer Gardner confronted him, he thought the officer was asking him to add money to his card, as he mistakenly used a card with a negative balance. With respect to the bottles he was carrying, Mr. Mejia-Cortez testified that he had purchased the beer in Maryland on the way to his friend's house in Hyattsville. Contrary to Officer Gardner's account, Mr. Mejia-Cortez said he was carrying four Pilsner beer bottles, not six, in a pack—two sealed full bottles and two empty bottles—and that two of the bottles were open because he "had had those over at [his] friend's house." He did not throw out the two empty beer bottles, he said, because he "just got the bag when [he] was leaving [his] friend's house."

During closing argument, the prosecutor argued that the credible evidence indicated that Mr. Mejia-Cortez was carrying six beer bottles, not four, and that two of them were partially consumed and were thus open containers for purposes of the POCA statute. When, during his rebuttal argument, the prosecutor began reciting the language from the subsection of the POCA statute under which Mr. Mejia-Cortez was charged—the section prohibiting POCA "in or upon . . . a street, alley, park, sidewalk or parking area," D.C. Code § 25-1001(a)(1)—the trial court stated, "[N]ow that you've read it, I was noticing that they don't mention a subway here," and asked, "[W]hat part of the statute do you think this fits?" The prosecutor

responded that "at a minimum, it falls under . . . number four"—meaning D.C. Code § 25-1001(a)(4), a different subsection that prohibits POCA in "[a]ny place to which the public is invited and for which a license to sell alcoholic beverages has not been issued under this title."[2] The prosecutor said nothing further about the no-license requirement of subsection 4 and did not specify what evidence established that the incident occurred in a place that had not been issued a liquor license.

The court found Mr. Mejia-Cortez guilty under subsection 4 of the POCA statute, crediting Officer Gardner's testimony that "there were six bottles of beer, two of which were open and half full," and rejecting the argument that the bottles were not "open" because they were in a bag.[3] The court did not specifically mention the no-license requirement in its verdict.

## II.

On appeal, Mr. Mejia-Cortez argues that we should reverse his POCA conviction because the government failed to present sufficient evidence—or any

---

[2] "[T]his title" refers to Title 25, the set of laws in the D.C. Code regulating alcoholic beverages in the District of Columbia.

[3] Mr. Mejia-Cortez was also found guilty of second-degree theft for the fare evasion—a conviction he is not challenging on appeal. He was acquitted of a Bail Reform Act violation.

evidence—that the offense occurred in a place "for which a license to sell alcoholic beverages has not been issued." D.C. Code § 25-1001(a)(4). When addressing a challenge to the sufficiency of the government's proof of an offense, we consider the evidence in the light most favorable to the government in determining whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316-20 (1979); *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc).

Mr. Mejia-Cortez's claim differs from the typical challenge to evidentiary sufficiency in that the government here acknowledges that it presented no evidence on the question whether the Washington Metro and Transit Authority (WMATA), the entity that operates the District's Metro system, had been issued a license to sell alcoholic beverages at the time of Mr. Mejia-Cortez's arrest. The government contends instead that we should conclude the evidence was sufficient to convict Mr. Mejia-Cortez because, in its view, "there is no question that a license to sell alcohol had not been issued for the Georgia Avenue Metro station."[4]

---

[4] The government makes a threshold argument that Mr. Mejia-Cortez waived his right to object to the trial court's general verdict of guilt by not requesting special findings of fact. *See Tyson v. United States*, 30 A.3d 804, 806 (D.C. 2011) (stating that when special findings are not requested in a bench trial, the trial court is not required to make them). Mr. Mejia-Cortez's challenge is to the sufficiency of the

The constitutional right to due process generally requires actual proof beyond a reasonable doubt of each element of an offense—not assurance that "there is no question" a critical fact exists—before a defendant can be convicted of committing that offense. *In re Winship*, 397 U.S. 358, 364 (1970). Such proof of a crime's essential elements is required even where the fact in question may seem incontrovertible. *See, e.g.*, *Turner v. United States*, 684 A.2d 313, 315 (D.C. 1996) (holding that, in order to convict the defendant of possessing an unregistered firearm, the government had to present proof that the machine gun the defendant possessed was not registered even though D.C. law prohibited the registration of machine guns).[5] Recognizing this, the government does not, at bottom, suggest that it could

---

evidence supporting his POCA conviction, however, not to the trial court's failure to state the basis for its verdict on the record. And "it is well settled in this jurisdiction that a 'full range of challenges' to the sufficiency of the evidence" is "automatically preserved at a bench trial by a defendant's plea of not guilty." *Carrell v. United States*, 165 A.3d 314 (D.C. 2017) (en banc) (quoting *Newby v. United States*, 797 A.2d 1233, 1238 n.2 (D.C. 2002)).

[5] The D.C. Circuit has on more than one occasion reversed a conviction under the federal statute prohibiting possession of drugs within 1000 feet of a school zone where the government did not seek to admit a map or other evidence to establish that the defendant possessed drugs within the proscribed area. In *United States v. Johnson*, the government "inexplicably" introduced a measurement made by an officer indicating a distance of 994 feet from an elementary school to a point "five feet up the walkway" to Mr. Johnson's home. 46 F.3d 1166, 1169 (D.C. Cir. 1995). The government indicated on appeal that it "would easily have established" at trial that the distance to Mr. Johnson's home was less than 1000 feet by measuring the distance in a straight line on a map, contending that the officer's measurement

satisfy its burden by pointing to the obviousness of a particular fact in lieu of presenting proof. Instead, it asks this court to "take judicial notice that all drinking is prohibited on the Metro, which leads to the self-evident inference that the Metro station had not been issued a license to sell alcohol."

"A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Christopher v. Aguigui*, 841 A.2d 310, 311 n.2 (D.C. 2003) (quoting Fed. R. Evid 201(b)); *see also Poulnot v. District of Columbia*, 608 A.2d 134, 141–42 (D.C. 1992). Thus, a court may take judicial notice of its own records, *Daniels v. United States,* 33 A.3d 324, 330 (D.C. 2011), of the jurisdiction's "laws and statutes," *Gaither v. District of Columbia*, 333 A.2d 57, 59 (D.C. 1975),

---

"diverted from a straight line path because of obstacles such as buildings." *Id.* at 1169–70. The court concluded that it was still necessary to furnish proof, noting that "the government, for whatever reason, offered no map establishing that fact." *Id.* at 1170; *see also United States v. Applewhite*, 72 F.3d 140, 143 (D.C. Cir. 1995), on reh'g in part (Feb. 13, 1996) (finding insufficient evidence where the government "measured only the distance between the school and a point short of the location of the drugs" and "did not present evidence from which the jury could determine the omitted distance"); *see also see also United States v. Herrera-Ochoa*, 245 F.3d 495, 502 (5th Cir. 2001) ("Simply put, the government had readily available to it all the evidence needed to prove its case. Its having failed to successfully marshal the evidence at trial, the trial court consequently erred in finding the evidence sufficient to support the conviction.").

and of many other facts one cannot reasonably contest. *See, e.g.*, *Shannon v. United States*, 206 F.2d 479, 481 (D.C. Cir. 1953) ("Because of the 13-hour differential, we may judicially notice that when it was midnight, January 2, 1946 here, it was 1:00 p.m., January 3, 1946, in the Philippines."); *Bruno v. Western Union Financial Servs., Inc.*, 973 A.2d 713, 715 n.3 (D.C. 2009) (taking judicial notice of driving distances); *W.M. v. D.S.C.*, 591 A.2d 837, 840 (D.C. 1991) (holding that the trial court did not err in taking judicial notice "that the period of conception is about 280 days, or nine months").

As a threshold matter, separate and apart from whether a no-license finding is the sort of fact that can be judicially noticed, the government faces a potential setback in that the trial court itself never took judicial notice of the fact the government now asks this court to notice. Although our cases make clear that judicial notice can be taken on appeal, *see Christopher*, 841 A.2d at 311 n.2, this court has expressed skepticism about taking judicial notice of facts that were not presented to or judicially noticed by the trial court or that were judicially noticed inexplicitly or *sua sponte*, *see, e.g., Bradley v. United States*, 107 A.3d 586, 600 (D.C. 2015) ("What is objectionable is for a court to take judicial notice of CourtView records *sub silentio*"), or of proffered facts whose relevance depends on other factual development or vetting. Thus in *Bradley*, this court found a due process

violation based in part on the trial court's failure to make a record of certain extra-record information it relied on in sentencing the defendant, even where that information had the hallmarks of evidence that would warrant judicial notice. *Id.*; *see also Harrison v. United States*, 76 A.3d 826, 833 (D.C. 2013) (stating that taking judicial notice of court records *sua sponte* "may create an appearance of partiality"); *Williams v. Auerbach*, 285 A.2d 701, 703–04 (D.C. 1972) (concluding that it would be "most unfair" to hold that the trial court was required to take judicial notice of certain housing regulations that the plaintiff raised only vaguely after resting his case, rather than pleading it or raising it at trial, where "the issue could have been joined and witnesses called to testify on the precise matter"). This reluctance to take judicial notice is most keen where, as here, the proffered fact is an essential element of a criminal offense.[6] While the government may at times establish an essential

---

[6] In *Broome v. United States*, 240 A.3d 35 (D.C. 2020), we acknowledged our case law stating that it was "'objectionable' for a court to take judicial notice *sub silentio* without giving parties notice and an opportunity to be heard," *id.* at 44 (citing *Bradley*, 107 A.3d at 600-01), but found that any such error in that case was harmless because the trial court had "disclosed the fact that was being noticed," *id.* (quoting *Harrison*, 76 A.3d at 833. And in *Brooks v. United States*, 130 A.3d 952 (D.C. 2016), we declined to address a question of judicial notice that the government had not argued, but noted that "one treatise concludes that an appellate court may not take judicial notice for the first time on appeal of a fact, not considered by the factfinder, that would 'supply an essential element of proof.'" *Id.* at 956 n.3 (quoting 29 Am. Jur. 2d Evidence §§ 46-47). In a footnote in its supplemental brief, the government acknowledges *Brooks*'s reference to this treatise and counters that "at least one other treatise explains that, in some circumstances, even in criminal cases,

element of a criminal offense using facts that were judicially noticed by the trial court, giving the government the benefit of a judicially noticed fact that the trial court never admitted into evidence would "allow the prosecution to do through argument to this Court what it is required by due process to do at the trial," and would "turn the [judicial notice] doctrine into a pretext for dispensing with a trial." *Garner v. Louisiana*, 368 U.S. 157, 173 (1961)[7] (quoting *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 302 (1937)); *cf. also United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001) ("Taking judicial notice in this case of an essential element of the crime . . . potentially infringes on Herrera's right to have each element proved beyond a reasonable doubt.").

To be sure, this court has readily taken judicial notice of particularly

---

an appellate court may take judicial notice of certain kind of facts." This rejoinder does not meet the force of the treatise quoted in *Brooks* because the treatise the government cites does not suggest that *an essential element* is among the "certain kind of facts."

[7] The defendants in *Garner* were convicted of disturbing the peace after refusing to move from a seat at a café counter when an employee of the café advised them to do so. *Id.* at 158. During post-conviction proceedings, the government argued that it would be proper for the Supreme Court to consider that it would have been apparent to the trial court that the defendants' presence at the café counter might cause a disturbance of the peace, given "the history of race relations and the high degree of racial segregation which exist[ed] throughout the South." *Id.* at 173. The Supreme Court rejected that premise, commenting that there was "nothing in the records to indicate that the trial judge did in fact take judicial notice of anything." *Id.*

straightforward facts—ranging from statutes and court records to driving distances and the length of human gestation—even where the trial court never considered these facts. *See e.g., Robert Siegel, Inc. v. District of Columbia*, 892 A.2d 387, 395 n.11 (D.C. 2006) (taking judicial notice of D.C. Council hearings that were not part of the record). The government appears to acknowledge that the no-license finding is not in this category when it suggests that the trial court *did* take judicial notice, albeit implicitly, by drawing an unstated reasonable inference from the statute prohibiting food and drink on the Metro, which was "a point of law the trial court [was] presumed to know." Yet there is little basis for surmising that the trial court *did* take that notice, that it *did* draw that inference, or that it even contemplated applying the judicial notice doctrine at all. The government mentioned the no-license requirement for the first time *after* it rested its case, when it asserted that it had proven a violation of subsection 4, as opposed to the version of the offense (subsection 1) it had charged in the information. The prosecutor never conveyed the theory the government now presses on appeal—that the court could take judicial notice of the law prohibiting food and drink on the Metro and then reasonably infer from that law "that WMATA does not have a license to sell alcohol." And even assuming the food-and-drink prohibition were properly considered part of the evidentiary calculus despite never having been alluded to, there would still be an analytical leap to the inference the government wants drawn. That makes this a bad

candidate for judicial notice in the absence of any findings on or discussion about the logic of the connection between the statute restricting food and drink on the Metro and the proffered fact regarding the absence of a liquor license. *See Poulnot*, 608 A.2d at 141–42.

Second, the government also cannot meet the basic standards for judicial notice. In order to justify application of the doctrine, the government had to demonstrate that it was either generally known in the District or capable of accurate determination through dependable sources that WMATA did not have a license to sell alcohol at the Georgia Avenue station on the day Mr. Mejia-Cortez was arrested there. D.C. Code § 35-251. As noted above, even if the government is right that everyone knows people cannot consume food and drink in Metro stations, and even if we took judicial notice of that statutory ban, the existence of that ban is not tantamount to proof that the operator of such stations cannot possess a license to sell alcohol. There are reasons to question the accuracy of the inference the government asks us to draw. The evidence the government proffers in its appellate brief as supporting judicial notice—a listing of holders of licenses to sell alcoholic beverages from the Alcoholic Beverage Regulation Administration website—does not purport to show that WMATA was not licensed on the date of Mr. Mejia-Cortez's arrest. In addition, the fact that licenses can be transferred from one holder to another as well

as from one location to another and can be held in "safekeeping" for months and even years while the holder takes steps to commence or resume business operations[8] demonstrates that the correlation between existing licenses and the establishments with which they are associated is not always logical or discernible. The Alcoholic Beverage Regulation Administration (ABRA) issues temporary licenses for special events, *see* D.C. Code 25-115, and both parties acknowledged at oral argument that it is not out of the realm of possibility that Metro might seek such a temporary license for an event at a particular station. The document the government cites to substantiate the no-license element does not appear to include temporary licensees, and it is unclear whether the nonexistence of a temporary license is even verifiable from an official source. Further, the ABRA's list of licensees distinguishes the licensees by "Establishment Type," and one such possible Establishment Type is "Railroad," which is used currently to categorize Amtrak's liquor license. *See* Alcoholic Beverage Regulation Administration, ABC License List—July 1, 2019, https://abra.dc.gov/node/1415756; https://perma.cc/DT2M-BW4G (last visited July 19, 2021). Some Metro stations, such as Union Station, are located within larger

---

[8] *See Padou v. District of Columbia Alcoholic Beverage Control Bd.*, 70 A3d 208, 210 n.1 (D.C. 2013); *Tiger Wyk Ltd., Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 825 A.2d 303, 305 (D.C. 2003); *see also* D.C. Code § 25-791 (2012 Repl.).

complexes where alcohol is legally sold. The government acknowledged that food and drink are sold at stations in "some subway systems in other jurisdictions." While these considerations certainly do not foreclose the possibility that Mr. Mejia-Cortez was arrested in a place for which no liquor license had been issued, they sufficiently muddy the matter so as to undercut the suggestion that the proffered fact was commonly known and that it could be accurately determined through dependable sources.

In Mr. Mejia-Cortez's case, the government may have been able to prove the no-license element. *See Johnson*, 46 F.3d 1166, 1170 (D.C. Cir. 1995) (stating that if the government could "easily have established" the element in question, "we have no idea why the government did not prove it"). But it failed to do so, and the circumstances do not support taking judicial notice on appeal. The government describes this omission as "a technicality." The right to be convicted only upon proof of each element beyond a reasonable doubt is in fact a fundamental aspect of due process. Because the evidence was insufficient to establish an essential element of the POCA offense of which Mr. Mejia-Cortez was convicted, we reverse his conviction and remand so that the trial court may enter a judgment of acquittal.

*So ordered.*

WASHINGTON, *Senior Judge*, concurring:   While I disagree with Judge Thompson that it is appropriate for us to take judicial notice of an individual Metro station's lack of a particular license, I agree that appellant's conviction for violating a section of the POCA statute with which he was not charged amounted to a prejudicial constructive amendment that also requires reversal of appellant's conviction in this case.

THOMPSON, *Associate Judge*, concurring in the judgment:   My colleagues have determined to reverse Mr. Mejia's conviction for possessing open containers of alcohol ("POCA") at the Georgia Avenue/Petworth Metro Station on the ground that the government failed to prove that the Georgia Avenue/Petworth Metro Station did not have a license to sell alcoholic beverages on the day in question.  I cannot join my colleagues in reversing Mr. Mejia's conviction on that basis, as I think we all know that the Georgia Avenue/Petworth Metro Station did not and does not have a license to sell alcoholic beverages.  (That no doubt explains why no one suggested otherwise at trial or in the parties' opening briefs and reply brief in this case.)

My colleagues reach their conclusion with barely a mention of this court's recent opinion in *Broome v. United States,* in which we noted that judicial notice may be taken of facts that are so "well-known by all reasonably intelligent people in the community" that "it would not be good sense to require formal proof"; that

judicial notice may be taken of such facts on appeal and may be taken even of a fact that "constitutes an element of the offense"; and that judicial notice is "a doing away . . . with the formal necessity of evidence because there is no real necessity for it." 240 A.3d 35, 42, 43 (D.C. 2020) (internal quotation marks omitted). This is just such a case.

Nevertheless, I concur in the judgment reversing the conviction, but for a different reason: what I believe was a prejudicial variance between the criminal information by which Mr. Mejia was charged in this case, and the theory the government advanced at trial. *See Berger v. District of Columbia*, 597 A.2d 407, 410 (D.C. 1991).

The information in this case charged Mr. Mejia with a violation of D.C. Code § 25-1001(a)(1): possession of an open container of alcohol "in or upon . . . [a] street, alley, park, sidewalk or parking area." But at trial, the government proved that Mr. Mejia had open containers of alcohol (Pilsner beer) at the time he went through the exit gate at the Georgia Avenue/Petworth Metro station, and the prosecutor asserted — *for the first time during his rebuttal closing argument* — that this was a violation of D.C. Code § 25-1001(a)(4): possession of an open container of alcohol "in or upon . . . [a]ny place to which the public is invited and for which a license to sell alcoholic beverages has not been issued under this title [D.C. Code

Title 25].” This, I think, was an unfair and prejudicial surprise, because it “deprived [Mr. Mejia] of an adequate opportunity to prepare [his] defense.” *Byrd v. United States*, 579 A.2d 725, 727 (D.C. 1990).

Before the presentation of evidence began, Mr. Mejia's counsel agreed to consolidation of Mr. Mejia's trial for the charged POCA violation and fare evasion with his trial for a charged Bail Reform Act (“BRA”) violation. Counsel told the court that he had no objection to the government's motion to join the two cases because he saw no problem and no benefit to the defense of keeping them “split up.” Thereafter, Mr. Mejia also chose to testify in his own defense. His testifying as to the BRA charge turned out to be a good decision: Mr. Mejia explained in his testimony that he had forgotten his court date, and the court acquitted him, finding that the government had failed to prove that Mr. Mejia had the requisite intent (willfulness) for a BRA violation. But Mr. Mejia's testimony regarding the POCA charge supplied the evidence that permitted the trial court to convict him, even if in theory the Georgia Avenue/Petworth Metro station might have had a license to sell alcoholic beverages.

The testimony of Metro police officer Zachary Gardner established that Mr. Mejia was carrying a black plastic bag containing two half-empty bottles of beer when he exited through the Metro station fare gate. Mr. Mejia testified that he

purchased the beer in Maryland; that the unsealed bottles were open because he "had those" while at a friend's house in Hyattsville, Maryland; that the beer bottles were in the black bag when he left the friend's house; and that he boarded the subway in ("c[a]m[e] from") Maryland. Thus, Mr. Mejia's testimony established that he did not purchase the beer at the Georgia Avenue/Petworth Metro station and that the unsealed bottles were opened before he got to that station. What's more, defense counsel cited Mr. Mejia's testimony to emphasize that the opened beer bottles were "covered by a bag," confirming that the bottles were not tendered to and opened by a station employee.

It seems clear from the Alcoholic Beverage Regulation Administration ("ABRA") regulatory scheme that the reason why it is not criminal to have an open container of alcohol at a place that is open to the public and has a license to sell alcoholic beverages is that places that are so licensed "may permit a patron to bring to and consume on the licensed premises an alcoholic beverage that the licensee is permitted to sell or serve under its license; *provided that, the alcoholic beverage is opened by an employee of the establishments or event*." 23 D.C.M.R. § 717.1 (emphasis added).[1] In light of that ABRA regulation and the statutory prohibition

---

[1] "However, the license shall not permit any alcoholic beverage opened on the

against possessing an open container of alcohol on the streets or sidewalks, D.C. Code § 25-1001(a)(4) cannot reasonably be read to permit the bringing of open containers of alcohol obtained elsewhere onto ABRA-licensed premises and possession of them there. Thus, even if the trial court had focused on the licensure status of the Georgia Avenue/Petworth Station and then declined to take judicial notice of the station's non-ABRA-license status, Mr. Mejia's testimony established that his possession of a bag containing open bottles of beer that he brought to the Metro station in that condition fell squarely within the intent of the prohibition of D.C. Code § 25-1001(a)(4).

I think there is at least a reasonable probability that Mr. Mejia would have declined to testify if his counsel had had notice that he could be found guilty under § 25-1001(a)(4). In other words, unlike *Berger*, this is a case in which appellant's "defense would have been different had the information included" a citation to the specific subparagraph of the POCA statute under which he was convicted instead of the citation to a different subparagraph. *Berger*, 597 A.2d at 410. I therefore agree that fairness requires reversal of his conviction.

---

licensed premises to be removed." *Id.*