**Steven T. HARRISON and Denardo D. Hopkins, Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 10–CF–583, 10–CF–655.

District of Columbia Court of Appeals.

Argued Feb. 5, 2013.

Decided Aug. 29, 2013.

Donald L. Dworsky, for appellant Steven T. Harrison.

Christopher R. Pudelski, for appellant Denardo D. Hopkins.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman and Vinet Bryant, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and BLACKBURNE-RIGSBY, Associate Judges, and FERREN, Senior Judge.

FISHER, Associate Judge:

Appellants Steven Harrison and Denardo Hopkins challenge several of their convictions stemming from an attempted armed robbery and felony murder. We affirm, vacating only those convictions that merge.

## I. Background

Brian Thompson purchased marijuana from his friend Michol Brown ("Mike–Mike") approximately two times per week. On three of those occasions, Thompson's childhood friends, Steven Harrison and Denardo Hopkins ("Boo Boo") accompanied him, although they did not purchase any marijuana themselves. On the first occasion, Harrison stated, "Let me get your man," which Thompson interpreted to mean "that he [Harrison] wanted to rob [Brown]." Hopkins was present but did

not say anything. Similarly, on "another trip to buy weed," Harrison stated, "Son, let me get your man for his money and drugs." Hopkins was again present but said nothing. On both occasions, Thompson refused, saying, "That's my man."

On December 3, 2007, Harrison and Hopkins again accompanied Thompson when he went to purchase marijuana from Brown. They picked Thompson up from his uncle's house before meeting Brown at an AutoZone located on South Capitol Street. Hopkins parked in the parking lot and, while the three waited for Brown to arrive, Harrison again stated to Thompson, "Let me get your man." Thompson again said, "[N]o, I can't let you all … get him," to which Hopkins responded, "So what? You scared?"

When Brown arrived and parked nearby, Thompson got out of the car. Thompson was "getting halfway to [Brown's] truck" when Harrison exited Hopkins' vehicle. Thompson "waved to [Harrison] to tell him to go back," but Harrison continued walking towards the truck. Thompson got into Brown's vehicle behind the front passenger seat. Harrison sat behind the driver's seat. Kenyada Davis ("Little K"), Brown's best friend, sat in the front passenger seat.

Once both Harrison and Thompson were inside Brown's vehicle, Brown passed marijuana to Thompson in exchange for fifty dollars. Shortly thereafter, Thompson observed Hopkins walking towards Brown's truck from the driver's side. As Hopkins was still approaching Brown's vehicle, Harrison "pulled out the gun [1] to K [Davis] and tell both of them [Brown and Davis] to give it up." [2] In response to

---

1. Thompson described the gun wielded by Harrison as a "40," silver and black in color.

2. Davis similarly testified that the individual who sat on the driver's side of the back seat (behind Brown) had a handgun out and stated, "Don't nobody move. You all know what time it is."

Harrison's demand and gesture, Davis "reached back and tried to take the gun." Harrison then fired a shot that hit Davis. Within seconds, Hopkins fired through the driver's side window of Brown's vehicle, shattering the glass and striking Brown. Brown and Davis then ran into the Auto-Zone store. Brown collapsed and later died; Davis suffered a gunshot wound from which he recovered.

Harrison and Hopkins ran back towards their vehicle and drove away, leaving Thompson behind. Thompson "didn't want to ... get caught on the scene," so he drove to Congress Park in Brown's vehicle and parked it in an alley. Thompson then went to a nearby recreation center where he encountered Harrison and Hopkins. Thompson asked Hopkins, "Man, why y'all do that?" In response, Hopkins told Thompson, "Son, I think I killed one of them." Thompson said he thought Hopkins just "shot him in his shoulder," but Hopkins replied, "No, I did kill him, son." During this conversation, Hopkins told Thompson that the type of gun he had was a "9." Thompson never saw Brown or Davis with a gun that night; Thompson himself did not have a gun.

On February 28, 2008, after Harrison was advised of and waived his rights, he gave a videotaped statement to Detective Dwayne Corbett. In the statement, a redacted version of which was played for the jury,[3] Harrison acknowledged that he fired his gun inside the truck. Although Harrison stated that he believed the front seat passenger was reaching for something, he admitted that he reached for his gun first. Detective Corbett testified that Harrison did not assert at any point during the interview that he saw either Davis or

Brown with a gun—either inside the vehicle or outside, as Davis and Brown were running away.

Hopkins testified that he was not in the parking lot of the AutoZone store that evening, and he denied planning to rob or attempting to rob Brown or Davis. Hopkins also asserted that he did not shoot either Brown or Davis.

Hopkins and Harrison were each charged with conspiracy to commit robbery, D.C.Code §§ 22–1805a, –2802 (2001); two counts of attempted armed robbery, D.C.Code §§ 22–2802, –4502, –1801 (2001); four counts of possession of a firearm during a crime of violence or a dangerous offense, D.C.Code § 22–4504(b) (2001); felony murder while armed, D.C.Code § 22–2101, –4502 (2001); assault with intent to kill while armed, D.C.Code §§ 22–401, –4502 (2001); and carrying a pistol without a license, D.C.Code § 22–4504(a) (2001). Additionally, Harrison was charged with tampering with physical evidence, D.C.Code § 22–723 (2001); malicious destruction of property, D.C.Code § 22–303 (2001); obstructing justice, D.C.Code § 22–722(a)(2)(A) (2001); and threats to do bodily harm, D.C.Code § 22–407 (2001). On March 11, 2010, a jury found Hopkins guilty on all counts. The jury acquitted Harrison of obstruction of justice and threats, but found him guilty on all other counts.

## II. Analysis

### A. Judicial Notice

■ On January 12, 2010, Judge Rankin[4] held a pretrial hearing on Harrison's oral motion to suppress his statement. Detective Corbett testified that Harrison

---

3. The court instructed the jury before the video was played that "[y]ou are only to consider this evidence with respect to Mr. Harrison. You are not to consider this evidence with respect to Mr. Hopkins."

4. Judge Rankin agreed to hear this motion while Judge Dixon was finishing another trial.

spent "over ten hours" at the hospital to receive treatment for a hand injury he sustained while trying to elude the police. After they reached the police station, Detective Corbett advised Harrison of his rights and Harrison agreed to speak with him. During the interview, Harrison was not handcuffed, Corbett did not have his weapon drawn, and Corbett did not threaten Harrison in any way.

When Harrison's counsel was cross-examining the detective, the court called counsel to the bench and announced it was taking judicial notice that Harrison had been convicted of armed robbery in a case in which he made a videotaped confession, and that Harrison was represented in the prior case by the same counsel who represented him in the current matter. "I just say this because one of the things that the Court has to take into consideration ... [is] his past experience with the system. And so it looks like he's well experienced and knows all about his rights and confession." It is not clear from the record what brought this information to Judge Rankin's attention.

At the conclusion of the hearing, the trial court found "that this statement that Mr. Harrison gave at the 7th District was voluntary given his knowledge of his constitutional rights and that the waiver was a valid waiver." The court also observed that appellant's prior experience with the system was relevant to the determination of voluntariness; "the records [containing the facts] are public record"; and "the very first thing [the court] did when [it] saw [the information] was to call it to [the parties'] attention." The court reasoned that it "would be foolish of the court to try

to make a decision on a constitutional issue such as this without having facts that help to determine whether or not this young man's freedom of choice was overborne by police tactics or methods."

 As appellant concedes, a court may take judicial notice of its own records. *See Washington v. United States,* 760 A.2d 187, 194–95 (D.C.2000). We caution, however, that doing so *sua sponte* may create an appearance of partiality.[5] Nevertheless, "bias is not shown by taking judicial notice of relevant evidence." *In re Marshall,* 549 A.2d 311, 314 (D.C.1988); *see also id.* at 312 n. 3 (noting that the judge had collected other court files related to attorney charged with contempt). Moreover, the procedures employed by the trial court in this case were fair. The trial court disclosed the facts that were being noticed, explained why, and gave appellant an opportunity to contest those facts.

Ultimately, appellant has not shown that the court's taking of judicial notice prejudiced him by affecting the outcome of his motion to suppress. Harrison's counsel, who was uniquely qualified to do so, did not question the accuracy of the facts noticed by the court. Appellant does not dispute the legal relevance of those facts. Moreover, although his counsel urged him to do so, Harrison chose not to testify at the hearing, so there was no evidence to contradict the detective's testimony. There was no reversible error here.

### B. Hopkins' Motion to Sever

 "When two or more defendants are charged with jointly committing a

---

5. Indeed, at a later point during the hearing, Harrison's counsel argued that Judge Rankin should recuse himself from ruling on the motion because the court had "prejudg[ed]" the case based on the facts of which it had taken judicial notice that were "more or less outside the record." The court rejected this argu-ment, reasoning "that the Court certainly has the authority to take judicial notice over its own records and evidence that's pertinent to the facts that have to be determined at this type of a hearing." Harrison does not challenge the denial of his motion to recuse.

criminal offense, there is a strong presumption that they will be tried together." *Jennings v. United States*, 431 A.2d 552, 556 (D.C.1981). We will reverse a trial court's denial of a motion to sever "only if [an appellant] shows he suffered 'manifest prejudice' as a result of being tried jointly." *Hargraves v. United States*, 62 A.3d 107, 115–16 (D.C.2013).

Hopkins has not made this demanding showing. The evidence against Hopkins certainly was not *de minimis*. Moreover, his focus on the four counts in which Harrison alone was charged is meritless. A lack of mutual admissibility is insufficient without a showing of "substantial prejudice that poses 'a serious risk that a joint trial would compromise a specific trial right ... or prevent the jury from making a reliable judgment about guilt or innocence....' " *Bailey v. United States*, 10 A.3d 637, 643 n. 7 (D.C.2010) (quoting *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)). The trial court was careful to instruct the jury where appropriate that certain evidence applied solely to one defendant and was not to be considered in evaluating the government's case against the other defendant. *See Catlett v. United States*, 545 A.2d 1202, 1212 (D.C.1988) ("The jury is presumed to have followed the instructions."); *see also Zafiro*, 506 U.S. at 540–41, 113 S.Ct. 933 (same). Finally, Hopkins' contention that "Harrison's counsel was permitted to act as a second prosecutor against Hopkins by pointing the finger at Hopkins at trial" is not supported by the record.[6] There was no prejudice to Hopkins requiring severance.

### C. Statements in Furtherance of the Conspiracy

Statements of co-conspirators are admissible against all members of the conspiracy provided "the party seeking to introduce the statement establishes that (1) it is more probable than not a conspiracy existed, (2) the defendant had a connection to the conspiracy, and (3) the conspirator made the statements during the course of, and in furtherance of, the conspiracy." *Holiday v. United States*, 683 A.2d 61, 86 (D.C.1996). "The trial court's decision to admit coconspirator testimony as nonhearsay will be upheld absent an abuse of discretion." *Id.*

Prior to trial, the government sought leave to admit four statements under the co-conspirator exception to the rule against hearsay.[7] After it heard argument from both parties, the court admitted the statements "providing the Government

---

**6.** The lack of support for Hopkins' argument is perhaps unsurprising in light of the fact that the "second prosecutor" problem typically arises in cases where codefendants present irreconcilable defenses. *See, e.g., Mitchell v. United States*, 569 A.2d 177, 182 (D.C.1990); *see also Reynolds v. United States*, 587 A.2d 1080, 1082–84 (D.C.1991). Here, Hopkins denied having participated in the offense, and Harrison contended that he acted in self-defense but, significantly, did not indicate Hopkins was present.

**7.** The four statements were Harrison's three iterations to Thompson of "let me get your man" and Hopkins' statement when Thompson demurred to Harrison's third request, asking, "So what? You scared?" We note

that these statements may not be hearsay at all—that is, an out-of-court statement offered for the truth of the matter asserted—because the declarant probably did not intend them as assertions of fact. *See, e.g., Martin v. United States*, 991 A.2d 791, 797 (D.C.2010) ("[Q]uestions usually cannot be characterized as intentional assertions and hence are not hearsay."); *see also United States v. Long*, 905 F.2d 1572, 1579 (D.C.Cir.1990) (" '[N]othing is an assertion unless *intended* to be one.' ") (quoting Fed.R.Evid. 801 advisory committee note). Nevertheless, the government has not pressed this argument, principally contending that each statement was properly admitted under the co-conspirator exception to the rule against hearsay. We therefore focus our analysis on the issue briefed by the parties.

during the course of the trial demonstrates the conspiracy...."

At trial, the complained-of statements were elicited through Thompson's testimony without objection. The trial court did not explicitly rule at the time of their admission that the government had met its threshold burden, nor did any party ask it to. However, the court later ruled, in denying Hopkins' motion for judgment of acquittal, that "there is sufficient evidence to support a finding of guilty on the charge of conspiracy to commit robbery." Hopkins now contends that the trial court erred in admitting the four statements because, "[a]t trial, it was not shown to be more likely than not that a conspiracy existed."

It is doubtful that the government proved that a conspiracy existed at the time the first two statements were made. However, there was ample evidence of a conspiracy by the time Hopkins taunted Thompson, "So what? You scared?" Shortly thereafter, appellants' actions spoke louder than words. *See Lucas v. United States*, 20 A.3d 737, 744 (D.C.2011) ("A jury may infer the existence of an agreement from the participants' actions."). Both appellants were armed with a handgun when they accompanied Thompson to purchase drugs from Brown. At the transaction site, Harrison followed Thompson into Brown's vehicle in spite of Thompson's instructions otherwise. Once both Harrison and Thompson were inside, Hopkins approached the driver's side window of Brown's vehicle. Shortly after the drug transaction was completed, Harrison displayed a weapon and demanded that Brown and Davis "give it up." Harrison then shot the seller's companion, Davis; within seconds, Hopkins shot Brown from outside the vehicle. The appellants then fled the scene together.

■ Any failure to lay a foundation for admitting the first two statements was harmless. Harrison's statements were admissible against Harrison as admissions of a party opponent. *See (Michael) Harris v. United States*, 834 A.2d 106, 115–16 (D.C.2003). Harrison's statements were also admissible against Hopkins to show Hopkins' knowledge and state of mind. *See Patton v. United States*, 633 A.2d 800, 808 (D.C.1993) (to show their effect on the listener). In Hopkins' presence, Harrison repeatedly asked Thompson, "Let me get your man." By the time Harrison made this statement for the third time, Hopkins clearly understood what Harrison had in mind. In fact, Hopkins' retort when Thompson disavowed the plan indicated that he shared Harrison's goal. Shortly thereafter, appellants implemented their plan.

### D. Statement Against Penal Interest

■ Prior to trial, the government sought leave to admit against both appellants a statement made by Harrison during a conversation with his then-girlfriend Toya Royals at the D.C. jail days after his arrest. As the government proffered in its memorandum, Harrison told Royals, "in substance": "Me and Boo–Boo was trying to rob somebody. The boy reached for my gun, and the gun went off, and somebody got shot. We left Brian down there and took the other car."

At a pretrial hearing, Hopkins argued that "the admission of th[e] statement made by Mr. Harrison would violate [his] confrontation clause rights...." After hearing argument from the government, the trial court concluded: "It's clear to the Court, upon review of the statement, that it is a statement against penal interest."

At trial, Royals was a reluctant witness. While she acknowledged visiting Harrison at the jail, Royals denied having a conversation "about why he was locked up." The government then referred Royals to her grand jury testimony and read aloud por-

tions where she repeated Harrison's statement. Hopkins' only objection was that "refreshing is more appropriate at this point," an objection the trial court overruled. *See* D.C.Code § 14–102(b) (2001).

Hopkins now reiterates the constitutional objection he made during the pretrial hearing, and also argues that Harrison's statement was not admissible as a statement against Harrison's penal interest, and thus also was not admissible against Hopkins. We reject both claims, and emphasize that this issue is significant only as it pertains to Hopkins; Harrison's statement would be admissible against him as an admission by a party opponent. *See Harris*, 834 A.2d at 115–16 (D.C.2003).

 Harrison's statement does not implicate Hopkins' rights under the confrontation clause because it is not testimonial. *See Thomas v. United States*, 978 A.2d 1211, 1227 (D.C.2009) ("[C]asual remarks to acquaintances in which the speaker ... confidentially admitted having committed or intending to commit a crime" are not testimonial.). Where "a defendant's extrajudicial statement inculpating a co-defendant is *not* testimonial, *Bruton*

does not apply...." *Id.* at 1224–25 (citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)).[8] Finally, if a statement is a declaration against penal interest, "*Carpenter's* requirements [do] not apply" and the statement is properly "admitted without redaction against the non-declarant defendant[ ]." *Id.* at 1227 (citing *Carpenter v. United States*, 430 A.2d 496, 503 (D.C.1981) (en banc)).[9]

 The statement satisfies our standard for admission under the penal interest exception. *See Thomas*, 978 A.2d at 1228; *Laumer v. United States*, 409 A.2d 190, 199 (D.C.1979) (en banc). Royals testified under oath before the grand jury that Harrison made this statement;[10] Harrison was unavailable to testify;[11] finally, "corroborating circumstances clearly indicate[d] the trustworthiness of the statement," where the statement was made shortly after Harrison's arrest, to his then-girlfriend, whom he presumably trusted. *Id.* Additional corroborating circumstances include the fact that the statement was consistent with the testimony of several government witnesses, including Thompson and Davis. Moreover, the

---

**8.** In *Bruton*, the Court held that where a "powerfully incriminating" extrajudicial statement which inculpates both the declarant and a codefendant is admitted against the declarant (who does not testify) but not against his codefendant, a trial court's limiting instructions are an "[in]adequate substitute for [the codefendant's] constitutional right of cross-examination." *Bruton*, 391 U.S. at 135, 137, 88 S.Ct. 1620. The Court suggested redacting references to codefendants as a means for allowing the prosecution to use such a statement in a joint trial "without at the same time infringing the [nondeclarant's] right of confrontation." *Id.* at 133–34 & n. 10, 88 S.Ct. 1620. *See Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (approving redaction).

**9.** In *Carpenter*, we held that "Rule 14 requires that the trial court take appropriate steps to minimize the prejudice inherent in codefen-

dant confessions which are inadmissible against the nondeclarant defendant," even "where the declarant codefendant takes the stand [and thus] no confrontation problem is presented." 430 A.2d at 502.

**10.** While Royals denied this at trial, her testimony made clear that she was reluctant to testify against her ex-boyfriend and his "real close" friend, Hopkins. Royals dated Harrison for about a year and had a child with him. After Royals was impeached with her grand jury testimony, she confirmed that when Detective Corbett came to her mother's house with a subpoena, she told him she wasn't coming to court. Royals admitted that when she later went to see the prosecutor and Detective Corbett, she told them that she was not going to testify.

**11.** *See Thomas*, 978 A.2d at 1228 n. 42.

statement "was sufficiently against [Harrison's] penal interest that a reasonable person in his position would not have made the statement without believing it to be true"; it was not " 'merely [an] attempt[ ] to shift blame or curry favor.' " *Thomas,* 978 A.2d at 1229–31 (quoting *United States v. Hammond,* 681 A.2d 1140, 1145 (D.C. 1996)). Finally, even if there was error, it was harmless in light of the other compelling evidence against Hopkins, including his own admission to Thompson that he killed Brown.

### E. Jury Management Issues

#### 1. Background

A jury trial commenced on January 22, 2010, and the first witness was called to testify on January 25. On January 27, a juror failed to appear (never to be seen again) and the trial continued with thirteen jurors. A series of delays occurred, many attributable to the court's efforts to accommodate scheduling conflicts experienced by jurors.

On February 18, the jury began its deliberations. Just before the jury retired, the court substituted an alternate for juror number 411, who had international travel plans. Juror 411 thus became the only potential alternate to the twelve members of the jury, and he was informed of the possibility of being "recalled for service in this case"; "for that reason, you may not yet have any discussions with anyone about this case."

The jury deliberated through the afternoon on the 18th, and all day on Friday, the 19th. Deliberations resumed on Monday, February 22, for half a day. That morning, the jury sent out two notes, one asking about Hopkins' role as an aider and abettor and the other asking about the tampering with physical evidence charge against Harrison.

The next morning, February 23, the court informed the parties that a juror had "suffered a medical incident and was taken last night to the hospital for observation." The court then instructed the parties: "We have two choices at this point. We can continue with 11 jurors or we can continue this matter over until Thursday to await the possible return of the missing juror [from the hospital]." Counsel for both appellants objected to going forward with eleven, opting to wait until Thursday. When the court learned on Friday, February 26, that the juror was still hospitalized, it continued the recess until March 10, the next date on which all jurors could be present.

On Wednesday, March 10, the hospitalized juror was still ailing, and the court declared that the juror was "not available." The court had not solicited the views of the parties on this question, but no one objected. The parties were given a choice to proceed with eleven jurors or to recall the juror (number 411) who had been excused earlier. Voir dire of juror 411 revealed that he had discussed the case after he was excused. The juror told the court that he had explained to others why the case was "taking as long as it had," with reference to the "many pieces of evidence," "many witnesses," and the "many days where [they] didn't meet." The juror indicated, however, that "I haven't been influenced, my view hasn't changed.... I haven't had anyone dissuade me to think one way or the other at this time." Although the court did not make any explicit findings about the ability of the alternate to be fair and impartial, it nonetheless made two crucial observations: "[Y]es, he has had discussions. But he's also said that he can come in and be fair and deliberate with the jury...." "[T]his juror has told us that those outside conversations haven't affected him."

The government pointed out the pitfalls of reseating the juror, given his outside discussions, and suggested they proceed

with eleven jurors. Both appellants, fully informed, argued for a mistrial or, in the alternative, reseating juror 411. Upon denying appellants' motion for a mistrial, the court addressed each appellant individually to explain the situation and solicit their preference. After consulting with his counsel, each appellant orally confirmed his preference to reseat juror 411. Juror 411 was reseated, and the court instructed the jury to begin its deliberations anew. The jury began deliberating at 11:20 a.m. that day, sending out two questions more than three hours into deliberations.[12] The following day, the jury reached its verdicts.

### 2. Coercion Claim

▆▆▆▆ Harrison contends that the trial delays "created a coercive environment in which the jury naturally just wanted to get things over with." " 'The first inquiry' " we must make " 'is into the inherent coercive potential of the situation before the court. The second inquiry requires an examination of the actions of the trial judge in order to determine whether these actions exacerbated, alleviated or were neutral with respect to coercive potential.' " *Davis v. United States,* 669 A.2d 680, 683 (D.C.1995) (quoting *(Robert) Harris v. United States,* 622 A.2d 697, 701 (D.C.1993)). In this case, neither inquiry reveals "circumstances [that] posed an inherent potential risk of a coerced verdict." *Id.* at 684.

The trial certainly spanned a long period of time, but the jury was present for testimony, argument, and deliberations for only about half that time.[13] There were no notes from the jurors suggesting they felt pressured or that they had reached an impasse. Moreover, the trial court appears to have done almost everything possible to minimize any coercive potential by accommodating various scheduling conflicts faced by the jurors. Therefore, "[c]onsidering all these factors from the jur[y's] point of view, we see no coercion in the surrounding circumstances." *Payne v. United States,* 932 A.2d 1095, 1108 (D.C. 2007); *see also Hankins v. United States,* 3 A.3d 356, 361–63 (D.C.2010).

### 3. Denial of Motion for Mistrial

▆▆▆▆ "A mistrial … is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *Parker v. United States,* 757 A.2d 1280, 1286 (D.C.2000) (internal quotation marks omitted). Accordingly, we will reverse an order denying a mistrial "only if the decision appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice." *Id.* (internal quotation marks omitted).

▆▆▆▆ Appellants do not question the trial court's decision to excuse the ailing juror,[14] and there is no requirement that a trial court declare a mistrial if it "finds it necessary to excuse a juror for just cause

---

12. The two notes, as the court observed, were "essentially the same notes that we received earlier." Appellant Harrison contends that the timing and substance of the jury's questions demonstrate that deliberations "had not begun anew, but picked up where they had left off." An equally plausible interpretation, however, is that the jury followed the court's mandate and began its deliberations anew, during the course of which similar questions arose.

13. The court was closed due to inclement weather for three business days, from Febru-

ary 10 through February 12. The court also was closed the following Monday, February 15, to observe a federal holiday.

14. Interpreting Super. Ct.Crim. R. 24(c), we have stated: "[A] trial court appropriately may find an empaneled juror 'unable or disqualified to perform juror duties' under circumstances that might not amount to 'manifest necessity' for a mistrial were an alternate juror unavailable—for example, where the court perceives a serious risk that the juror's ability to deliberate fully and fairly will be

after the jury has retired to consider its verdict...." *Shotikare v. United States,* 779 A.2d 335, 343 (D.C.2001). To the contrary, Super. Ct.Crim. R. 23(b) explicitly gives the trial court discretion to permit further deliberations by the remaining eleven jurors, and it may do so over objection if the specified criteria are met. *Id.* ("The authority ... conferred on the court is to be exercised ... only when 'extraordinary circumstances' and 'just cause' are present."). We review that decision for abuse of discretion. *Id.* The trial judge, who was best positioned to assess any potential prejudice to appellants from excusing the ailing juror, concluded that he could not "see any prejudice to anyone," and we have not been persuaded otherwise on appeal. *See Peyton v. United States,* 709 A.2d 65, 69 (D.C.1998) ("The fundamental rationale in leaving the matter of prejudice *vel non* to the sound discretion of the trial judge is that the judge is in the best position to evaluate it." (alteration removed) (internal quotation marks omitted) (quoting *State v. Hawkins,* 326 Md.

270, 604 A.2d 489, 493 (1992))). Absent a showing by appellants that such a "severe remedy" was mandated, we cannot find that the trial court abused its discretion in denying appellants' motion for a mistrial. *See Parker,* 757 A.2d at 1285–87 (trial judge did not abuse discretion in evaluating the effect of extra-judicial communications to a juror); *see also Shotikare,* 779 A.2d at 347 ("having properly excused [a juror], the trial judge did not abuse his discretion in allowing a verdict to be returned by the remaining eleven jurors rather than declaring a mistrial"; the mere potential of an unknown impact on the outcome "does not without more mandate declaration of a mistrial").

### 4. Reseating Juror 411

■ Once the trial court properly denied appellants' motion for a mistrial, the court had two alternatives: proceeding with the remaining eleven jurors in accordance with Super. Ct.Crim. R. 23(b), or reseating juror number 411 [15] consistent with Super. Ct.Crim. R. 24(c). [16] The court

---

compromised because the juror faces financial hardship; suffers health problems; has inflexible travel plans; cannot or will not pay adequate attention; or the like." *Hinton v. United States,* 979 A.2d 663, 680 (D.C.2009) (en banc) (citations omitted).

15. The reseating of juror 411 would not have been possible prior to the 2000 amendment of Rule 24(c). *See Bulls v. United States,* 490 A.2d 197, 202 (D.C.1985) ("any juror substitution, once deliberations have begun, violates Super. Ct.Crim. R. 24(c)"). However, our decision in *Bulls* was based upon then-existing Rule 24, which only spoke of replacing jurors with alternates " 'prior to the time the jury retires to consider its verdict.' " *Id.* at 200 (quoting previous version of Rule 24(c)) (emphasis in *Bulls* ). As amended, Rule 24(c)(3) now provides: "If an alternate replaces a juror after deliberations have begun, the Court shall instruct the jury to begin its deliberations anew." In *McCallum v. United States,* we held that the 2000 amendment

"effectively overruled" *Bulls.* 808 A.2d 1242, 1243 (D.C.2002).

16. In *McCallum,* we made clear that retention of alternate jurors under Rule 24(c)(3) does not require sequestration but only "that the judge 'take appropriate steps to insulate the jurors ..., for example, by separating the alternates from the deliberating jurors and instructing the alternate jurors not to discuss the case with any other person until they replace a regular juror.' " 808 A.2d at 1244. These requirements were fulfilled here. The fact that the juror did not comply with the court's admonition does not preclude reseating him. *See Leeper v. United States,* 579 A.2d 695, 698 (D.C.1990) (" '[T]he remedy for allegations of juror bias is a hearing to determine whether the misconduct actually resulted in prejudice. Following a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion....' " (quoting *Washington v.*

presented these two options to the parties, who had already heard the *voir dire* of juror 411. That colloquy revealed that juror 411 had not received any information about the case from outside the courtroom. Both appellants argued forcefully that, if they were not granted a mistrial, the court should proceed with a jury of twelve that would include juror 411. The trial court accommodated appellants' request, and observed, "I think it's always in the defense's best interest to go forward with 12, as opposed to 11. Actually, I would have been surprised if they had taken any other position...." We cannot find reversible error in these circumstances, where the trial court followed the course advisedly urged by appellants. *See Preacher v. United States*, 934 A.2d 363, 368 (D.C. 2007) ("Generally, the invited error doctrine precludes a party from asserting as error on appeal a course that he or she has induced the trial court to take."); *see also Brown v. United States*, 627 A.2d 499, 508 (D.C.1993) (noting that "[w]e have repeatedly held that a defendant may not take one position at trial and a contradictory position on appeal").

### F. Hopkins' CPWL Conviction

▪ At the time of these offenses, a "pistol" was defined as "any firearm with a barrel less than 12 inches in length." D.C.Code § 22–4501(a) (2001). Nevertheless, it is not strictly necessary to prove barrel length in order to establish that a particular firearm is a pistol. For example, in *(Manuel) Brown v. United States*, 979 A.2d 630 (D.C.2009), the weapon was not recovered and no evidence was presented about the length of its barrel. However, appellant "repeatedly referred to the firearm as a pistol and specifically testified that the gun was a Colt .45 pis-

tol." *Id.* at 637. From this testimony, and other evidence suggesting the weapon was small in size, "we [were] satisfied that there was ample evidence from which the jury could infer that the gun was a pistol." *Id.* at 638.

Neither of the weapons used by appellants was recovered, but Hopkins told Thompson that the gun he had used was a "9." The bullet recovered from Brown's body was identified by Carl Rone, a forensic firearms examiner, as a ".38, .357 to 9mm bullet" that was fired by a Smith & Wesson weapon. Further, according to Rone, "Smith & Wesson makes revolvers and pistols." On cross-examination, Rone confirmed that the bullet that struck Brown was fired by either a .38 special revolver or a 9mm semiautomatic pistol. *See Curington v. United States*, 621 A.2d 819, 823 (D.C.1993) (permitting inference from similar evidence that weapon used was a pistol).

▪ The prosecutor apparently forgot to ask Mr. Rone about the barrel length of the weapons he had described. She therefore called Officer Luciano Morales to testify about that topic. Counsel for Hopkins objected, contending that Morales' proposed testimony was properly characterized as expert testimony and the defense had not been given the discovery required by Super. Ct.Crim. R. 16(a)(1)(E).[17] The trial court overruled appellant's objection, stating "[t]his is not expert testimony. It is more in the nature of a mechanic."

Officer Morales testified that he had been employed as a "firearms and toolmark examiner for the [Metropolitan] police department" for the past thirteen years. In this capacity, he had had "occasion to examine ... the weapons that come

*Washington Hosp. Ctr.*, 579 A.2d 177, 185 (D.C.1990) (citations omitted))).

17. Counsel for Harrison joined in the objection at trial but does not raise this issue on appeal.

into [his] possession for barrel length." These weapons included 9mm, .38 caliber, and .357 caliber firearms made by Smith & Wesson, as well as .40 caliber or 10mm weapons marketed by a variety of manufacturers, including Smith & Wesson, Colt, Kelt-tec, Walther, and Sig Arms. Based on this experience, Morales testified that "[w]eapons [of those calibers] that are recovered in the District of Columbia ... have a barrel length of less than 12 inches." On cross-examination, Morales acknowledged that he had "no idea what type of firearm was used to commit any sort of crime in this case."

■ Hopkins contends that the court improperly admitted Morales' testimony because he was expressing an expert opinion. We conclude, to the contrary, that Officer Morales was giving factual testimony based upon his own knowledge and perception.[18] The testimony of witnesses "is admissible if predicated upon concrete facts within their own senses, as distinguished from their opinions or conclusions drawn from such facts." *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 847–48 (10th Cir.1979).[19] *See Jones–Harris v. State*, 179 Md.App. 72, 943 A.2d 1272, 1278–79 (2008) ("While [nurse] indisputably had medical knowledge far superior to that of a layperson, the objected to testimony did not call for the expression of an opinion by her."). Because Morales' testimony was based on his familiarity with the outward appearances of specified types of pistols he was asked to describe, the trial court did not err in permitting him to testify without the trappings of an expert witness.

## G. Precluding Certain Impeachment

■ Hopkins contends that the trial court erred by precluding him from impeaching Thompson with recorded telephone conversations suggesting that Thompson conspired with his girlfriend and mother to smuggle drugs into the D.C. jail. "'After sufficient cross-examination has been allowed to satisfy constitutional requirements, the trial court retains broad discretion to determine the scope and extent of cross-examination.'" *Velasquez v. United States*, 801 A.2d 72, 79 (D.C.2002) (quoting *Elliott v. United States*, 633 A.2d 27, 32 (D.C.1993)). "We then review the trial court's limitations on cross-examination for an abuse of discretion." *Id.*

"[T]o survive objection, the questioner must proffer some facts which support a genuine belief that the witness is biased in the manner asserted." *Brown v. United States*, 683 A.2d 118, 124–25 (D.C.1996) (internal quotation marks omitted); *see also Sherer v. United States*, 470 A.2d 732, 738–39 (D.C.1983). Although the code-word conversations suggest an effort to obtain marijuana, there was no reason to think Thompson feared prosecution for this apparently unsuccessful effort, especially in light of the fact that he was

---

18. We acknowledge that, as a matter of epistemology, it may not be possible to draw a "rigid distinction between fact and opinion. ..." *Asplundh Mfg. Div. v. Benton Harbor Eng'g.*, 57 F.3d 1190, 1195 (3d Cir.1995). "In a sense all testimony to matter of fact is opinion evidence, i.e., it is a conclusion formed from phenomena and mental impressions." *Id.* (internal quotation marks omitted). Nonetheless, the law of evidence does not insist that all fact witnesses must be treated as if they are expressing opinions.

19. *Cf. Smith v. United States*, 583 A.2d 975, 983 (D.C.1990) ("Under Federal Rules of Evidence 602, '[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'"); *United States v. Doe*, 960 F.2d 221, 223 (1st Cir.1992) (personal knowledge "includes inferences and opinions, so long as they are grounded in personal observations and experience").

implicated in an attempted armed robbery and felony murder.

■ Hopkins' theory that Thompson had a motive to curry favor with the government was thoroughly explored during trial. Thompson confirmed that when he was arrested, Detective Corbett told him he was facing seventy years in prison; accordingly, Thompson "wanted to cut [himself] a deal to get free of this murder charge[.]" He was testifying pursuant to a cooperation agreement and had pled guilty to accessory after the fact to assault with intent to kill. "So, instead of facing 70 years [he was] facing [a maximum sentence of] seven and a half[.]" Thompson had not been sentenced at the time of his trial testimony, and he hoped the prosecutor would "come into court and tell [the judge] just how cooperative [he was.]" Thus, he had to convince the prosecutor that he was cooperating. Hopkins was also able to explore the topic of Thompson's personal animosity towards him. Thus, the issue of testimonial bias was addressed at length, and the trial court did not abuse its discretion by precluding inquiry about Thompson's quest for marijuana.[20]

## H. The Evidence Was Sufficient

Both appellants challenge the sufficiency of the evidence to support their convictions for conspiracy to rob, assault with intent to kill, attempted armed robbery, and felony murder. "In reviewing such claims, the court views the evidence in the light most favorable to the government and a conviction will be overturned only where there has been no evidence produced from which guilt can reasonably be inferred." *Howard v. United States*, 966 A.2d 854, 855 (D.C.2009) (internal quotation marks omitted).

■ To establish the existence of a conspiracy, the government must demonstrate "(1) an agreement between two or more persons to commit a criminal offense; (2) knowing participation in that agreement with intent to commit the criminal objective; and (3) during the life of the conspiracy, and in furtherance of its objective, the commission by at least one conspirator of at least one of the overt acts specified in the indictment." *Castillo–Campos v. United States*, 987 A.2d 476, 482 (D.C.2010) (internal quotation marks omitted). The government may, but need not, establish these elements through direct evidence. *Id.*

■ There was ample evidence from which a jury could infer the existence of a conspiracy to rob Brown. Prior to the day of the crimes, Harrison twice stated to Thompson in the presence of Hopkins that he wanted to "get" Thompson's man (Brown). On the day the crimes took place, Harrison again indicated his intention to rob Brown, stating to Thompson, "Let me get your man." When Thompson objected, Hopkins asked him, "So what? You scared?" Appellants, thereafter, acted upon their stated intentions: both appellants were armed when they accompanied Thompson to buy drugs from Brown; at the transaction site, Harrison approached Brown's vehicle and, once inside,

---

**20.** Hopkins also argues that the trial court abused its discretion by permitting the government to present in rebuttal some statements with which he had not been confronted on cross-examination. We review a trial court's decision to allow rebuttal evidence for abuse of discretion, and find none here. *See Shelton v. United States*, 983 A.2d 979, 985–86 (D.C.2009); *see also Rowland v. United States*, 840 A.2d 664, 680 (D.C.2004). The trial court heard argument from Hopkins' counsel, carefully parsed the statements at issue, and admitted only certain portions that impeached Hopkins' testimony on a "direct issue in the case." Even if we assume for the sake of argument that these statements were erroneously admitted, any error was harmless in light of the ample evidence against Hopkins.

pulled out a weapon and demanded money; Hopkins stood outside the driver's side of Brown's vehicle; within seconds after Harrison shot at Davis, Hopkins shot through the car window at Brown.

 Viewed in the light most favorable to the government, the evidence established that Harrison shot Davis with the specific intent to kill. *See Fletcher v. United States*, 335 A.2d 248, 251 n. 5 (D.C. 1975) ("In so firing at very close range, [appellant] could be found to have acted with specific intent to kill."). This evidence is sufficient to establish AWIKWA. *See Freeman v. United States*, 912 A.2d 1213, 1219 (D.C.2006). Because appellants were armed, and because the shooting of Davis was a natural and probable consequence of the conspiracy to commit robbery, Hopkins was liable for Harrison's conduct. *See Wilson–Bey v. United States*, 903 A.2d 818, 840 (D.C.2006) (en banc) (internal quotation marks omitted) (alteration in original) ("[T]he *Pinkerton* doctrine provides that a co-conspirator who does not directly commit a substantive offense may [nevertheless] be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement.").

 An "intent to rob may be inferred not only from the words uttered by the suspect but also from his conduct or from the totality of the evidence." *Jones v. United States*, 516 A.2d 929, 932 (D.C. 1987) (internal quotation marks omitted). That Davis became a target of robbery can be inferred from Harrison's statement, "Don't nobody move[,]" while he was inside Brown's vehicle with Davis, Brown, and Thompson and from Thompson's testimony that Harrison "pulled out the gun to K [Davis] and tell *both of them* [Brown and Davis] to give it up." (Emphasis added.) Hopkins was liable as a co-conspirator.

"The essential elements of felony murder while armed are that the defendant, while perpetrating or attempting to perpetrate a specified felony while armed, inflicted an injury on the victim from which he died." *Head v. United States*, 451 A.2d 615, 625 (D.C.1982). " '[T]he government must prove that the killing was done in furtherance of the underlying felony when it seeks to make an aider and abettor who did not actually do the killing liable for felony murder.' " *In re D.N.*, 65 A.3d 88, 93 (D.C.2013) (quoting *Butler v. United States*, 614 A.2d 875, 886 (D.C.1992)).

 The evidence was sufficient to convict appellants for felony murder. Harrison told both Brown and Davis to "give it up," and thereafter shot Davis. Only seconds later, Hopkins fired a shot that struck and eventually killed Brown. From this evidence, the jury could have found that Hopkins killed Brown in furtherance of appellants' attempt to rob these two victims. This evidence also supports Harrison's conviction for felony murder under a co-conspirator theory of liability. *See Wilson–Bey*, 903 A.2d at 840.

## I. The Government's Closing

 During closing, the government argued: "Hopkins cannot be believed when he sat before you and testified that he was not there. . . . In order for you to believe that this is the huge frame-up that [Hopkins] wants you to believe, this would have to have been concocted by Brian Thompson, Kenyada Davis, Genelle Tate, Toya Royals, Simone Woodward, Detective Corbett, mobile crime officers, the DNA analysts, . . . the medical examiners, the firearms examiner, me, everybody would have to be in on it. . . ." In response to Hopkins' objection, the prosecutor explained that she referred to herself in the argument because one of the government's witnesses, Royals, testified that "when she

came down to our offices, she was confused and that ... we threatened to take her kids, an interview that I clearly was supposed to have been a part of...." In overruling appellants' objection for the third time, the court explained, "I mean, without the specific reference given by [the prosecutor], I would have agreed that her argument was on the edge, but there was a factual basis for her to make that argument based on what one witness suggests might have happened in front of the grand jury. So it is not even on the edge at that point; it is back within the realm of acceptable argument."

As the government concedes in its brief, the statements made by the prosecutor in this case are akin to the statements of the prosecutor in *Coleman,* which we found to be impermissible.[21] *Coleman,* 948 A.2d at 548–49. However, even if the complained-of language was impermissible, we nonetheless must affirm appellant's convictions unless he can demonstrate "substantial prejudice" as a result of the prosecutor's error. *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991). We cannot find substantial prejudice here where the evidence against Hopkins was ample, and the trial court instructed the jury prior to closing arguments that "[t]he statements ... and the arguments of the lawyers are not evidence. They are only intended to assist you in understanding the evidence." *See Gray v. United States,* 589 A.2d 912, 918 (D.C.1991) ("The trial court ... instructed the jury that counsel's statements in closing were not evidence. Juries are presumed to follow the trial court's instructions.").

## J. Merger of Convictions

The indictment alleged that the felony murder was committed while appellants were attempting to rob Brown. The government therefore concedes that appellants' convictions for the underlying felonies of attempted robbery (of both Brown and Davis) merge with their convictions for felony murder. We agree. *See (Bryant) Matthews v. United States,* 13 A.3d 1181, 1191 (D.C.2011) ("[A] person cannot be convicted of *both* felony murder *and* the underlying felony that supported the felony murder conviction.").

Appellants assert that their four convictions for PFCV merge into one PFCV conviction per appellant whereas the government argues that two PFCV convictions should survive for each appellant. We agree with the government. The assault with intent to kill Davis while armed does not merge with the felony murder of Brown. Those separate shootings arose from fresh impulses and targeted different victims, and the PFCV charges associated with these separate assaultive acts do not merge. *See Wages v. United States,* 952 A.2d 952, 964 (D.C. 2008) ("As a rule, crimes do not merge if they are perpetrated against different victims."); *(Antonio) Matthews v. United States,* 892 A.2d 1100, 1106 (D.C.2006) ("The general rule when the convictions for the predicate crimes do not merge is that the associated PFCV convictions do not merge either.").

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court but re-

---

**21.** The prosecutor in *Coleman* similarly vouched for the credibility of government witnesses, arguing, "And you know, ladies and gentlemen, that [the defendant] did it because why would the police; the government, Ms. Motz [AUSA], myself, Mr. Rosen who you saw; the detectives ... why would they spend four years of their lives investigating the wrong person.... Why would the police go after an innocent man and let the real killer go free? It makes no sense." *Coleman v. United States,* 948 A.2d 534, 548–49 (D.C. 2008).

mand for the limited purpose of vacating appellants' convictions for attempted armed robbery of Brown and Davis (counts 2 and 4, respectively) and two of appellants' PFCV convictions (counts 3 and 5), one associated with each attempted armed robbery. Resentencing is not required, as appellants' sentences for all of the PFCV counts are equal and concurrent, appellants' sentences for the armed robbery of Brown are less than, and current to, their sentence for the felony murder of Brown, and appellants' sentences for the armed robbery of Davis are less than, and concurrent to, their sentence for assault with intent to kill Davis.

*It is so ordered.*